1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DANIEL GARCIA CERVANTES,                       Case No.  1:20-cv-001446-JLT-BAM

12                       Plaintiff,
                                                    **FINDINGS AND RECOMMENDATIONS
13         v.                                       REGARDING PLAINTIFF'S MOTION FOR
                                                    SUMMARY JUDGMENT**
14   MARTIN O'MALLEY, Commissioner of
     Social Security,[1]                            (Doc. 23)
15
16                       Defendant.

17

18

19                                         **<u>INTRODUCTION</u>**

20          Plaintiff Daniel Garcia Cervantes ("Plaintiff") seeks judicial review of a final decision

21   of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental

22   Security Income under Title XVI of the Social Security Act and disability insurance benefits under

23   Title II of the Social Security Act.  The parties' briefing on the motion was submitted, without oral

24   argument, to Magistrate Judge Barbara A. McAuliffe for findings and recommendations.  (Docs. 18-

25   20.)  Having considered the parties' briefs, along with the entire record in this case, the Court finds

26

27   [1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.
     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley is substituted
28   for Kilolo Kijakazi as Defendant in this suit.

                                                    1

that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence in the record and based upon proper legal standards. Accordingly, this Court will recommend affirming the agency's determination to deny benefits.

### FACTS AND PRIOR PROCEEDINGS

Plaintiff applied for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income on February 14, 2017, alleging that he became disabled on August 30, 2012. AR 207-23.[2]  The claim was denied initially on April 19, 2017, and on reconsideration on July 25, 2017. AR 133-37, 143-49. Plaintiff requested a hearing before an administrative law judge ("ALJ") and ALJ Debra Underwood held a hearing on March 28, 2019. AR 38-84. ALJ Underwood issued an order denying benefits on the basis that Plaintiff was not disabled on June 10, 2019. AR 21-37. Plaintiff sought review of the ALJ's decision, which the Appeals Council denied. AR 3-8. This appeal followed.

**March 28, 2019 Hearing Testimony**

ALJ Debra Underwood held a hearing on March 28, 2019. AR 38-84. David Rinehart, an impartial vocational expert, also appeared and testified. AR 76-81. Plaintiff's attorney Jonathan Pena was also present. The ALJ began by asking Plaintiff's attorney whether he had any objections to admissions of any exhibits, and he responded that he had no objections and that the record was complete. AR 41. The ALJ then admitted exhibits into evidence. *Id.*

Upon examination by the ALJ, Plaintiff testified that he lived in a house on West Indianapolis Avenue in Fresno with his mother and his 27-year-old son. AR 44. Plaintiff stated that his mother and son were home during the day. AR 45. Plaintiff testified that he was left-handed and single. *Id.* He said that he did not have any children besides the son that lived with him, did not have a driver's license at the time of the hearing, but did have a driver's license when he was younger. *Id.* Plaintiff said that he got around using rides from friends and family. *Id.* He stated that he got to the hearing by getting a ride from his mother. *Id.* Plaintiff testified that he was six feet tall, weighed 355 pounds, graduated from Fresno High School, and completed one year of junior college. AR 45-46.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

Plaintiff testified that he did not remember the last day that he worked but recalled that it was in 2012.  AR 46-47.  He said that he believed he stopped working in approximately November 2012 and did not go back to work at the beginning of 2013 after the school's Christmas break.  AR 47.  He said that while working for the school district, he was usually off most of the summer, and did not work during the summer of 2012 but returned to work in August or September 2012 when school began.  AR 48.  Plaintiff's attorney stated that he would amend the alleged onset date in writing.  *Id.*  Plaintiff said that he worked as campus assistant and the duties included ensuring campus safety, watching the school grounds, and confirming that students were where they needed to be during school hours.  AR 49-50.  He said that he was on his feet all day in that role, had to lift 10 to 30 pounds, and ultimately stopped working at the job because he could not physically last an eight-hour day on his feet due to pain and the loss of motor function in his left leg.  AR 50-51.

Plaintiff testified that he also worked as a security officer at a miniature golf course, which overlapped with his campus safety job.  AR 51.  He stated that he worked at the school during the day and then worked part time at night at the miniature golf course.  *Id.*  Plaintiff estimated that he worked 25 to 30 hours a week at the miniature golf course and was paid $6.25 per hour.  AR 51-52.  At the miniature golf course, he worked with the public, worked in the parking lot, was constantly on his feet, would respond to calls requesting assistance, and would lift or carry approximately 60 pounds.  AR 52-53.  Plaintiff said that he left that job because he found it taxing when combined with his day job with the school district.  AR 53.

Plaintiff testified that he began getting medical care from Dr. Dickey and Dr. Booth for thyroid issues approximately two years before noticing his back issues.  AR 54.  He said that his thyroid issue caused fatigue, shortness of breath, blurry vision, dizziness, itchy skin, and weight gain.  *Id.*  He stated that he was prescribed a daily pill which caused some side effects such as itchiness and hair loss, but fewer hypothyroid symptoms.  AR 54-55.  Plaintiff said that he was also prescribed medication for high cholesterol and high blood pressure.  AR 55-56.  He stated that his high blood pressure caused his skin to turn red.  AR 56.

Plaintiff said that he determined he had gout from experiencing excruciating pain in his feet caused by calcium deposit buildup.  AR 56-57.  He stated that Dr. Dickey diagnosed those symptoms

3

as gout and he received medication and outpatient treatment for that ailment.  AR 57.  He said that he only took gout medication when he had a flareup, such as in December 2018, when he suffered from gout pain for multiple days.  AR 58.  He stated that he had gout flareups every four to six months.  *Id.* Plaintiff said that he would take the medication until it ran out and then would request more medication.  *Id.*

Plaintiff said that he was also diagnosed with diabetes by Dr. Magumbi at the Neighborhood Clinic because of blood work results and feeling symptoms of anxiety and hypertension.  AR 58-59. Plaintiff said that making dietary changes and keeping his sugar at appropriate levels meant that he did not experience symptoms.  AR 59.  He also said that he did not test his blood at home but would see the doctor for blood tests every three months.  AR 60.

Plaintiff said that his back problems started approximately a year before he stopped working, and he experienced back pain on the job.  AR 60.  He stated that Dr. Dickey referred him to a neurosurgeon at Community Hospital.  AR 61.  Plaintiff's attorney requested additional time to receive Plaintiff's records from Community Regional Medical Centers, and the ALJ permitted additional time.  AR 62.  Plaintiff said that the neurosurgeon gave him an MRI and showed him the problems with his back.  AR 63.  He said that the neurosurgeon recommended surgery at that time, but Plaintiff did not go through with it as he felt that given his age and the need to be laid up for a month. AR 64.  He stated that without the treatment, he received cortisone shots and high levels of pain medication.  *Id.*  Plaintiff said that he did not take the cortisone shots because "it could have damaged [him] in the long run" but took Naproxen and a muscle relaxant for his back.  AR 64-65.  Plaintiff stated that, at the time of the hearing, he was not taking the muscle relaxer unless he was in "absolute pain" and still took Naproxen.  AR 65.  Plaintiff said that at the time of the surgery recommendation, he was heavier, and the doctors recommended losing weight, noting that at one time he weighed 422 pounds.  *Id.*  Plaintiff said that his weight loss was related to the diet he followed regarding his diabetes.  AR 65-66.  Plaintiff said that he had done three or four different stints of physical therapy for his back, which helped but was a temporary solution.  AR 66.

Plaintiff stated that, because of his conditions, sitting bothered him a lot and he could sit for 10 to 15 minutes before he needed to stand up.  *Id.*  He said that he could stand for 10 to 15 minutes

before needing to sit down again.  AR 66-67.  He testified that he used a cane every day and always carried the cane as it helped with his balance and helped him after he lost feeling in his left leg.  AR 67.  He said that he felt like his left leg was asleep and he had a constant numbness in his foot and toes.  AR 67-68.  He stated that doctors said a bulging disc clamping down on the sciatic nerve caused the numbness.  AR 68.  He also said that when he used his cane, he would be able to walk 15 to 20 minutes before needing to sit down and take a break.  *Id.*  Plaintiff testified that he held the cane in his left hand, had used the cane for over five years, and could lift or carry no more than 15 to 20 pounds at the time of the hearing.  AR 69.

When questioned by his attorney, Plaintiff stated that he leaned forward onto his cane because it relieved some lower back pain.  *Id.*  Plaintiff said that when he was up and started walking, he walked with a limp and was very slow in comparison with his ability to walk before 2012.  *Id.*  He said that he would not walk across uneven terrain, tried to minimize walking up staircases, and would not be able to bend and grab something from the ground.  AR 70.  Plaintiff testified that apart from his left leg, his back pain also caused upper back pain and numbness in his right arm.  *Id.*  He said that when he looked right or straight, his right arm would go numb.  *Id.*  He stated that he was not able to lift heavier items.  *Id.*  Regarding chores, he said that sweeping was the chore that would least aggravate his pain, and he could throw out a bag of trash if it was not too heavy.  AR 71.  He said that he could fold laundry but could not move the hamper or unload the dryer as it was too low to the ground.  *Id.*  He stated that he used a bench in the shower to help him bathe and hoped he would not slip and fall in the shower.  *Id.*

Plaintiff testified that he had good days and bad days with his condition and had approximately a week of bad days per month.  AR 73.  During bad days, Plaintiff stated that he was unable to walk or move and would remain in bed.  *Id.*  He said that during good days, he would have to lay down and rest but tried to be as active as possible.  *Id.*  He stated that he rested for about four hours during daytime hours on good days.  *Id.*  Plaintiff said that his gout flareups usually lasted longer than two days and he had three flareups in 2018.  AR 74.  He testified that he had fallen about three times in 2018, which were caused by slips and by his dog.  *Id.*  He said that his sleep has been impacted by his pain, that he typically gets four to six hours of sleep per night, and that his days are rougher when he

gets four hours of sleep.  AR 74-75.  Upon further examination by the ALJ, Plaintiff clarified that he did not walk his dog but his dog caused him to fall when she ran to the door and tripped him.  AR 75.  Plaintiff also said that doctors additionally prescribed Tylenol with Codeine and another narcotic but said that he "didn't go that route."  *Id.*

Following Plaintiff's testimony, the ALJ elicited testimony from vocational expert ("VE") David Rinehart.  AR 76-81.  The VE testified that his resume was an accurate description of his qualifications, that he had not previously discussed his testimony, had read and listened to the work history testimony, and did not have further questions regarding Plaintiff's work history.  AR 76-77.  Plaintiff's attorney stated that he did not object to the VE testifying.  AR 76.  The VE characterized Plaintiff's past work as Campus Security Officer (DOT No. 372.367-010, semiskilled, SVP 3, light as defined by the Department of Labor but medium as actually performed); Security Guard (DOT No. 372.667-038, semiskilled, SVP 3, light as defined by the Department of Labor, but performed as a hybrid job with Material Handler); and Material Handler (DOT No. 929.687-030, semiskilled, SVP 3, heavy as defined by the Department of Labor and as performed, hybrid job with Security Guard).  AR 77.

The ALJ asked the VE hypothetical questions and asked the VE to assume an individual with the same age, education, and work experience as Plaintiff.  *Id.*  For the first hypothetical, the ALJ asked the VE to consider a hypothetical individual who: could sit for six hours in an eight-hour day; could stand or walk for six hours; could lift or carry 20 pounds occasionally and 10 pounds frequently; could never use ladders, ropes, or scaffolds; could occasionally stoop, kneel, crouch, or crawl; could frequently use ramps or stairs or balance; and would need to avoid all exposure to hazards such as moving machinery or unprotected heights.  AR 77-78.  The VE testified that the hypothetical individual could perform the Campus Security and Security Guard positions as defined by the Department of Labor at light, but not as actually performed at medium and heavy.  AR 78.  The ALJ then asked what the result would be if the hypothetical individual would require an assistive device for any walking.  *Id.*  The VE testified that both past jobs would be eliminated, but there would be other light, unskilled, entry level work for that individual, including: Electronics Worker (DOT No. 726.681-010, unskilled, SVP 2, light, with 32,900 jobs nationally); Information Clerk (DOT No.

237.367-018, unskilled, SVP 2, light, with 90,100 jobs nationally); and Sewing Machine Operator, Semi-Automatic (DOT No. 786.685-030, unskilled, SVP 2, light, with 33,900 jobs nationally). *Id.* The VE testified that his testimony was consistent with the Department of Labor reference books, though he also relied upon his work experience and education to address aspects of the hypothetical including the assistive walking device that were not addressed by the reference books. AR 79.

Plaintiff's attorney then asked the VE to consider a hypothetical individual who required an assistive device for walking as previously discussed but to add that: an assistive device was needed for balancing and standing; a sit/stand option was required; and the individual could sit for a 20-to-30-minute period and then would need five unscheduled minutes of standing and walking off-task. AR 79-80. The VE testified that the hypothetical individual could not perform any of Plaintiff's past work and that there would be no competitive work. AR 80.

Plaintiff's attorney then asked whether there would still be work available if the individual in the first hypothetical would have six instances of needing to take two days off per month over a twelve-month period. AR 80-81. The VE testified that the individual could perform past or other work if the absences were spread out over the course of the year. AR 81. The VE then testified that if the same hypothetical individual needed to take additional 20-minute breaks every hour, there would be no competitive work. *Id.*

Plaintiff's attorney closed by noting medical records including a straight leg raising test demonstrated Plaintiff's degenerative disc disease and stating that Plaintiff intended to propose an amended onset date of approximately February 1, 2013. AR 82-83. The ALJ noted that the record would be held open for two weeks to receive additional medical records and that Plaintiff's attorney could request further time. AR 83.

**Medical Record**

The relevant medical record was reviewed by the Court and will be referenced below as necessary to this Court's decision.

**The ALJ's Decision**

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff was not disabled under the Social Security Act. AR 21-37. Specifically, the

7

ALJ found that Plaintiff had not engaged in substantial gainful activity since August 30, 2012, the alleged onset date. AR 27. The ALJ identified the following severe impairments: degenerative disc disease of the cervical and lumbar spine; diabetes; and obesity. *Id.* The ALJ also noted that Plaintiff suffered from hypothyroidism and hypertension, but that these impairments did not cause more than a minimal effect on his ability to perform basic work activities and were therefore nonsevere. *Id.* The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments. *Id.*

Based on a review of the entire record, the ALJ found that Plaintiff retained the RFC to perform a full range of work at the light exertional level with the limitations that Plaintiff: could frequently climb ramps and stairs but never ladders, ropes, or scaffolds; could frequently balance; could occasionally stoop, kneel, crouch, and crawl; was required to avoid all exposure to hazards such as moving machinery and unprotected heights; and required an assistive device for walking. AR 28. The ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as "opinion evidence." *Id.*

The ALJ found that Plaintiff was unable to perform any past relevant work, was defined as a younger individual on the alleged disability date, had at least a high school education, and was able to communicate in English. AR 31. Given Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. AR 31-32. The ALJ noted that examples of jobs consistent with Plaintiff's age, education, work experience, and RFC included: (1) Electronics Worker (DOT No. 726.681-010, light, unskilled, SVP 2, with 32,900 jobs); (2) Information Clerk (DOT No. 237.367-018, light, unskilled, SVP 2, with 90,100 jobs); and (3) Sewing Machine Operator - semiautomatic (DOT No. 786.685-030, light, unskilled, SVP 2, with 33,900 jobs). *Id.* The ALJ therefore concluded that Plaintiff had not been disabled from the alleged onset date of August 30, 2012, through the date of the decision. AR 32.

///

///

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, this Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Servs.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

# DISCUSSION[3]

Plaintiff argues that the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's subjective symptoms.  (Doc. 18 at 6-7, Doc. 20 at 1-2.)

## A.  Plaintiff's Subjective Complaints

Plaintiff contends that the ALJ committed harmful error by failing to provide clear and convincing reasons for rejecting Plaintiff's testimony as inconsistent with the evidence.  (Doc. 18 at 6-7, Doc. 20 at 1-2.)  In deciding whether to admit a claimant's subjective complaints, the ALJ must engage in a two-step analysis.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004).  First, the claimant must produce objective medical evidence of her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.  *Id.* at 1015.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  AR 29.  However, the ALJ discounted Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms, noting that the statements were not consistent with medical evidence and other evidence in the record.  *Id*.  The ALJ was therefore required to provide specific, clear and convincing reasons for discounting Plaintiff's subjective complaints.

First, the ALJ found that Plaintiff's allegations were not fully consistent with the medical and other evidence, noting the "objective evidence, including consistently normal gait findings, overall conservative treatment, and fair response to treatment modalities, are not consistent with the claimant's allegations of symptoms and limited activities."  AR 30.  Although lack of supporting medical evidence cannot form the sole basis for discounting testimony, it is a factor that the ALJ can consider.  *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

---

[3] The parties are advised that this Court has carefully reviewed and considered all of the briefs, including arguments, points and authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or brief is not to be construed that the Court did not consider the argument or brief.

The ALJ contrasted Plaintiff's allegations with the objective findings as follows:

> The longitudinal medical evidence does not establish a level of severity of the claimant's impairments to prohibit substantial gainful activity. The claimant was diagnosed with degenerative disc disease of his cervical and lumbar spine. (Exhibit 8F). Included in the medical evidence is an MRI of the lumbar spine performed in September 2010. (Exhibit 8F/29). Findings noted degenerative disc disease seen at the L4-5 level with small central disc protrusion; congenital narrowed canal with up to moderate spinal canal stenosis; and partial sacralization of the LS vertebra to the left. (*Id*.). A subsequent imaging study of his cervical spine performed in October 2011 showed moderate central spinal stenosis at C4-C5 due to broad based disc bulge with severe stenosis of the C4-5 left lateral recess due to left lateral protrusion with annular tear; large disc bulge/protrusion at CS-6 causes mild central stenosis with moderate to severe right lateral recess narrowing; mild central spinal stenosis noted at C3-C4; and smaller disc bulges at C2-C3 and C6-C7. (Exhibit 8F/28). Relevant physical examination findings have generally reflected normal gait, motor strength within normal limits, and some intermittent decreased range of motion. (Exhibits lF, 2F, 4F, 7F). Treatment has included pain medications, muscle relaxants, and physical therapy. (*Id*).

> The claimant underwent a consultative examination in March 2017. (Exhibit 3F). He endorsed chronic low back pain that occasionally radiated into his left leg and some left leg numbness. Physical examination findings noted positive straight leg raise at 80° sitting and 70° lying down. He had decreased spinal range of motion. However, all other range of motion findings were within normal limits, including the lower extremities. There was good tone bilaterally with good active motion. Strength was 5/5 in all extremities. Gait was normal. Notes indicate that the claimant reported that he bought himself a cane and had used it for approximately 5 years. The examining physician diagnosed discogenic disease. (*Id*.).

> With regard to the claimant's diabetes mellitus, he reported home blood glucose levels within normal limits and denied hypoglycemia. (Exhibits 4F, 7F). Lab work from January 2018 reported his AlC at 5.8. (Exhibit 6F). This condition was treated with medications including Metformin. (*Id*.). The claimant was also advised on lifestyle activities such as diet and exercise. He was educated as to the comorbid effects of obesity. (*Id*.). The claimant underwent a diabetic foot evaluation and treatment in March 2017. (Exhibit 2F). Notes indicate that there was no obvious pain. A chronic skin lesion was present on the lateral right foot. Neurological examination findings noted the presence of sensory perception to the distal toes and forefoot. (*Id*.). His toenail were debrided, parred, and filed. He was advised to continue with antifungal cream. (*Id*)

11

AR 29-30.

In contrast to Plaintiff's allegations of pain and difficulties with walking, sitting, physical activities, and basic chores, the ALJ cited relatively normal physical examination findings, including normal gait, normal motor strength, somewhat decreased range of motion, and relatively normal blood glucose levels.  AR 29-30; *see, e.g.,* AR 310 (April 2012 report marking normal gait but abnormal ROM); 327 (March 2017 report noting "Motor: Good tone bilaterally with good active motion. Strength is 5/5 in all extremities. Romberg negative… Gait was normal although he did not want to try to walk on his toes or heels; however, he did buy himself a cane and has been using this for the past five years."); 331 (April 2017 report stating that Plaintiff denied hypoglycemia and noting "Musculoskeletal: No bone tenderness, no joint swelling or tenderness… Neurological/Psychiatric: Alert and oriented, no focal sensory or motor deficit"); 388 (April 2012 report marking normal gait and abnormal ROM); 372 (January 2018 lab work showing HBA1c levels at 5.8).  The ALJ therefore appropriately discussed the medical evidence as one factor in discounting Plaintiff's symptoms testimony.

Second, the ALJ noted that the "overall conservative treatment, and fair response to treatment modalities, are not consistent with the claimant's allegations of symptoms and limited activities," citing Plaintiff's medical record.  AR 30.  An ALJ is permitted to consider evidence of conservative treatment in evaluating a claimant's subjective complaints.  *See Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir. 2007) ("We have previously indicated that evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)).  Additionally, the effectiveness of medication or treatment is a relevant factor in determining the severity of a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3); *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017) ("[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability."); *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be effectively controlled with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

Here, the ALJ noted that "overall conservative treatment, and fair response to treatment modalities, are not consistent with the claimant's allegations of symptoms and limited activities."  AR 30.  In discussing Plaintiff's impairments and treatment, the ALJ noted that treatment for Plaintiff's degenerative disc disease included pain medications, muscle relaxants, and physical therapy, and that examination findings revealed generally normal gait and motor strength results with some intermittent decreased range of motion.  AR 29.  Regarding Plaintiff's diabetes and obesity, the ALJ noted that his diabetes mellitus was treated with medications including Metformin, Plaintiff was advised on lifestyle activities such as diet and exercise, Plaintiff was educated as to the comorbid effects of obesity, and Plaintiff's diabetic foot evaluation led to his toenail being debrided, parred, and filed and prescribed antifungal cream.  AR 30.  Indeed, the record typically demonstrated that a conservative combination of physical therapy, pain medication, and muscle relaxants appeared effective for treating Plaintiff's back pain while other medication appeared effective in controlling symptoms of Plaintiff's diabetes mellitus and obesity.  *See* AR 310 (April 2012 report noting back and lumbar strain was improving after a fall ten days before, medication helped with radiating pain, numbness, and tingling, but Plaintiff was "still stiff"); 391 (August 2011 report noting "LBP, resolved… ready to RTW."); 396 (October 2010 report noting "LBP, improved. Contin[ue] PT note to return to work 10-18-10 given to [Plaintiff]"); 322 (March 2017 diabetes foot evaluation and treatment report noting: "no obvious pain" but chronic skin lesion on lateral right foot that was "improved with the prescribed Ketoconazole," "presence of sensory perception to the distal toes and the forefoot;" toenails were debrided, parred, and filed for immediate relief; and recommendation to "Continue the ketoconazole as it has helped"); 323-27 (March 2017 report diagnosing low back pain, discogenic disease, radiculopathy subjectively, obesity, hypertension, hypothyroidism, and diabetes mellitus; noting medications included Metformin, Levothyroxine, Lisinopril, Simvastatin, Aspirin, and Terbinafine; reporting positive straight leg raising test; reporting results within normal limits for back and lower extremities; reporting Plaintiff had normal gait but had used cane for five years "mostly on a prn basis but recently… he said that the pain has increased, he uses the cane more often for balance and to protect his left side"); 331 (April 2017 report noting medications included Aspirin, Levothyroxine Sodium, Lisinopril, Metformin, Simvastatin, and Terbinafine and that Plaintiff "denies hypoglycemia").  In contrast with the more

severe limitations alleged, the ALJ highlighted the relatively conservative medications and physical therapy that appeared to be effective in controlling Plaintiff's symptoms.  The ALJ therefore appropriately considered evidence of conservative and effective treatment in evaluating Plaintiff's subjective testimony.

Plaintiff argues that the ALJ did not properly reconcile Plaintiff's subjective complaints that he cannot sit, stand, or walk greater than 20 minutes, has bad days for one week per month, and requires a cane for balance and standing with medical and other evidence in the record with physical exam findings noting reduced range of motion, decreased muscle strength, and at least one positive straight leg raising test when assessing a light RFC.  (Doc. 18 at 7.)  However, as discussed, the ALJ examined the medical evidence, including the positive straight leg raising test result, relatively normal range of motion results with some findings of reduced range of motion, normal gait findings, and motor strength findings.  The ALJ then expressly stated that she balanced the objective evidence, overall conservative treatment, and fair response to treatment modalities with Plaintiff's persistent subjective complaints, physical examination findings including the straight leg raising test, and repeat diagnoses to find that Plaintiff was limited to light exertional work with the additional limitations.  AR 30. Rather than ignore the range of findings, the ALJ described the key findings in the record and then reconciled the medical evidence, conservative treatment, and Plaintiff's own complaints.  AR 29-30. While Plaintiff puts forward another interpretation of the record, where "evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."  *Woods v. Kijakazi*, 32 F.4th 785, 788 (9th Cir. 2022) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); see also *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").  Plaintiff's argument therefore does not demonstrate that the ALJ failed to reconcile medical evidence in discounting symptoms testimony.

Plaintiff further contends that the ALJ did not point to any other basis for rejecting Plaintiff's subjective complaints beyond summarizing Plaintiff's treatment history.  (Doc. 20 at 2.)  Although a lack of medical evidence may not be the sole basis for discounting symptoms testimony, the ALJ may consider medical evidence along with other rationale such as conservative treatment and effective

control of conditions in examining Plaintiff's testimony.  *Burch*, 400 F.3d at 681, *Parra*, 481 F.3d at 751, *Wellington*, 878 F.3d at 876.  Here, the ALJ stated that the "objective evidence, including consistently normal gait findings, overall conservative treatment, and fair response to treatment modalities, are not consistent with the claimant's allegations of symptoms and limited activities."  AR 30.  Beyond this statement, the ALJ discussed how the medical evidence generally showed relatively normal findings and that conservative treatment was used to effectively control Plaintiff's symptoms.  AR 29-30.  The ALJ's discounting of symptoms testimony was therefore based on appropriate rationale, and Plaintiff's argument fails.

Accordingly, the Court concludes that the ALJ did not err in discounting Plaintiff's subjective complaints.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, IT IS HEREBY RECOMMENDED as follows:

1.   Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be denied; and

2.   The Clerk of this Court be directed to enter judgment in favor of Defendant Martin O'Malley, Acting Commissioner of Social Security, and against Plaintiff Daniel Garcia Cervantes.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, as required by 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that the failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 26, 2024**                    /s/ Barbara A. McAuliffe
UNITED STATES MAGISTRATE JUDGE

16